AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

Redacted Affidavit
Original filed on 1/10/24

FILED
RICHARD W. NAGEL
CLERK OF COURT

1/10/24

| In the Matter of the Search of | ) |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 127 ROCKWOOD AVENUE, DAYTON, OHIO 45405 | ) ) ) |

Case No.

3:24-mj-27

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Conspiracy with intent to distribute a controlled substance |
| 21 U.S.C. § 843(b) | Use of a communication facility to commit a felony |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Gregory A. Orick, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means).*

Date: 1/10/24

City and state: Dayton, Ohio

_____
Peter B. Silvain, Jr.
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF 127 ROCKWOOD AVENUE, DAYTON, OHIO 45405** | 3:24-mj-027<br><br>**Case No. _____** |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, Gregory Orick, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the premises known as 127 Rockwood Avenue,

Dayton, Ohio 45405, hereinafter "PREMISES," further described and pictured in Attachment A,

for the things described in Attachment B:

2.      I am a Task Force Officer ("TFO") with the Drug Enforcement Administration

("DEA"). As such, I am an officer of the United States who is empowered by law to conduct

criminal investigations of and to make arrests for offenses as detailed in 21 U.S.C. § 878.  I have

been a DEA TFO since August 2019.  I have been employed in law enforcement since December

1999.

3.      I currently serve as a detective with the Dayton Police Department ("DPD").  I have

been assigned to Patrol Operations and am currently assigned to the Narcotics Bureau.  I have

extensive prior experience in investigating drug cases that resulted in successful prosecutions of persons involved in the trafficking of drugs and gun related offenses. I have conducted narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics and weapons, participated in undercover narcotics purchases, and supervised the activities of informants who have provided information and assistance resulting in narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution and sales of controlled substances often operate. These subjects usually attempt to conceal their identities and the locations at which they reside, operate, or store drugs and drug proceeds.

4. During my career with the DEA thus far, I have participated in an assortment of controlled substances investigations, including investigations involving marijuana, cocaine, heroin, methamphetamine, fentanyl, and counterfeit pharmaceuticals. To date, I have assisted in the investigation of financial crimes to include money laundering, structuring habits, and bulk cash smuggling. I have interviewed witnesses, subjects, and defendants involved in and/or arrested for drug violations, and have participated in several joint interagency federal and state investigations. Additionally, I have participated in and supervised the use of confidential sources, conducted physical surveillance, affected search warrants and arrest warrants, and written numerous reports. I have also written multiple affidavits in support of applications for arrest warrants and search warrants, including search warrants for searches of residences, cellular telephone location pings, and GPS trackers. Through my training, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and

2

the manner in which they conduct these illegal activities. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the activities of drug smugglers and drug trafficking distribution networks.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### A. Overview of the Investigation

6. The United States, including the Drug Enforcement Administration Dayton Resident Office, is conducting a criminal investigation of a Drug Trafficking Organization ("DTO") involving DTO members Ricardo BUSBEE ("R. BUSBEE"), Torrence BUSBEE ("T. BUSBEE"), Dalaquan MCGUIRE, Demarion GALLOWAY, Doretha HUGHES, and others concerning potential violations of federal drug trafficking laws, including violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances), 846 (conspiracy to commit the same), and 843(b) (use of a telephone communication facility to facilitate a Title 21 offense).

#### i. Timeline

7. Throughout the investigation I have learned that this DTO has sold large quantities of fentanyl and/or fentanyl pills, cocaine, and methamphetamine in the greater Dayton, Ohio area, beginning in at least in or about September 2022 and continuing through the present.

3

8.      As I explain in more detail below, investigators have executed two series of premises search warrants in the course of this investigation. The first round of premises search warrants occurred on September 12, 2023, at the following three locations associated with the DTO:

- 130 Laura Avenue, Dayton, Ohio
- 210 Basswood Avenue, Dayton, Ohio
- 1830 Needmore Road, Dayton, Ohio

During the execution of the search warrants at the above locations, agents recovered drugs, drug trafficking paraphernalia, and firearms. None of the DTO members were arrested at that time.

9.      Several months later, on December 12, 2023, a federal grand jury indicted R. BUSBEE, T. BUSBEE, GALLOWAY, MCGUIRE, and HUGHES for drug trafficking and firearms offenses.

10.      On December 19, 2023, agents obtained search warrants at the four new locations investigators had learned were being used by DTO members:

- 202 East Bruce Avenue, Apartment 3, Dayton, Ohio
- 2061 Kensington Drive, Dayton, Ohio
- 820 Osmond Avenue, Dayton, Ohio
- 144 Kelly Avenue, Dayton, Ohio

11.      Agents executed those warrants on December 21, 2023. While searching the above four locations, agents found and arrested R. BUSBEE, T. BUSBEE, and GALLOWAY on the outstanding warrants stemming from the federal indictment. Agents seized evidence of drug trafficking, including drugs, firearms, drug trafficking paraphernalia, and significant sums of cash.

4

12. R. BUSBEE, T. BUSBEE, and GALLOWAY have remained in custody since their arrest on December 21, 2023.

13. As of the date of this affidavit, MCGUIRE and HUGHES remain at large, and the indictment remains sealed. As I explain in more detail below, I believe that MCGUIRE is staying at the **PREMISES**, and is actively trafficking drugs from there.

ii. **Summary of the Investigation**

14. As I explain in more detail below, I believe that the DTO is responsible for several overdose events. Further, I believe that the DTO members have used the cell phones listed in the chart below (collectively, the "TARGET CELL PHONES") and the addresses listed below in furtherance of their drug trafficking activities:

| TARGET CELL PHONE'S PRIMARY USER | TARGET CELL PHONE NUMBER & SERVICE PROVIDER | LOCATION(S) WHERE TARGET CELL PHONE USER ENGAGED IN DRUG ACTIVITY |
|---|---|---|
| R. BUSBEE aka "Cardo" | • 937-204-7506 (T-Mobile)<br>• 937-972-3966 (T-Mobile) | • 130 Laura Ave. (Sept. 2022—Sept. 2023)<br>• 210 Basswood Avenue (Sept. 2022— Sept. 2023)<br>• 820 Osmond Avenue (Sept. 2022—Present)<br>• 32 West Fairview Ave (spring-summer 2023) |
| MCGUIRE aka "Rico" | • 937-313-4128 (T-Mobile)<br>• 937-794-4752 (T-Mobile) | • 130 Laura Ave.(Sept. 2022— Sept. 2023)<br>• 210 Basswood Avenue (Sept. 2022— Sept. 2023) |

| GALLOWAY aka "Duke" | • 937-518-2205 (Verizon) | • 130 Laura Ave. (Sept. 2022—Sept. 2023)<br>• 210 Basswood Avenue (Sept. 2022— Sept. 2023) |
|---|---|---|
| T.BUSBEE aka "Woody" | • 937-716-0118 (AT&T) | • 210 Basswood Avenue (Sept. 2022— Sept. 2023) |

15. As I explain in more detail below, I learned the above information from a variety of sources, including a confidential and reliable informant of the DPD ("CS1")[1]. For context, CS1 has provided accurate and reliable information to the DPD regarding various investigations for several years. CS1 is a long-time resident of the Dayton, Ohio area, and has extensive personal knowledge of the substance abuse culture in Dayton. CS1 explained that, since at least September 2022 (which is when CS1 first approached me with information about this DTO), the above DTO members—R. BUSBEE, MCGUIRE, GALLOWAY, T. BUSBEE, and HUGHES—have been working together to sell drugs, which CS1 knew based on personal observations. Customers could call any one of the TARGET CELL PHONES to order drugs from the DTO. CS1 identified several locations the DTO used to sell drugs, with 130 Laura Ave. and 210 Basswood Ave. being the busiest locations for drug sales. On September 12, 2023, following an investigation into the DTO,

---

[1] CS1 has provided information to law enforcement in the past that has been independently corroborated. CS1 has never provided materially false information to law enforcement. CS1 is providing information to law enforcement for financial renumeration.

agents executed search warrants at several locations associated with the DTO—including 130 Laura Ave. and 210 Basswood Ave.—and seized evidence of the DTO's drug trafficking activities, including drugs, firearms, and numerous cell phones. As of the date of this affidavit, law enforcement is using forensic tools to try and access the seized cell phones, which remain locked.

16.     In early December 2023, CS1 explained that the DTO remained active, and that the DTO members continued to use the TARGET CELL PHONES to sell drugs.[2] CS1 said that s/he has continued to contact R. BUSBEE at TARGET CELL PHONE numbers (937) 204-7506 and (937) 972-3966 since the September 2023 search warrant; likewise, CS1 said that s/he has continued to contact MCGUIRE at TARGET CELL PHONE numbers 937-313-4128 and 937-794-4752 since September 2023. The fact that CS1 has used these TARGET CELL PHONES to contact the DTO <u>after</u> the September 2023 search warrant supports my belief that the TARGET CELL PHONES remained active. Further, CS1 had purchased drugs from the DTO in the two months immediately preceding December 2023, further supporting my belief that the TARGET CELL PHONES were being used in furtherance of drug trafficking activity.[3]

17.     As I describe in more detail below, another confidential source (CS3)

---

[2] As I explain in more detail below, is unknown if the DTO members transferred their old phone numbers to new physical devices following the seizure of the cell phones on September 23, 2023; since we have been unable to break into the seized phones, I cannot confirm what call numbers those phones were assigned. Based on my training and experience, it is not uncommon for drug traffickers to transfer their same phone numbers/accounts to new physical devices.

[3] I am purposefully excluding additional details about CS1's drug purchase in order to shield CS1's identity.

independently approached me in October 2023 and informed me that the DTO remained active and continued to use the TARGET CELL PHONES to sell drugs.

18. CS1 and CS3 each told me that the DTO stopped using 130 Laura Ave. and 210 Basswood Ave. to sell drugs after the execution of the September 2023 search warrants. According to both CS1 and CS3, the DTO now uses different locations to sell drugs.

19. Between December 8, 2023, and December 10, 2023, I obtained search warrants authorizing the collection of historical and prospective data for the TARGET CELL PHONES to determine, among other things, where each DTO member was residing and/or dealing drugs.[4] I began receiving data from T-Mobile on December 10, 2023, AT&T on December 14, 2023, and Verizon on December 14, 2023. As I explain in more detail below, I learned that the following TARGET CELL PHONES have frequently been at the locations listed in the below chart:

| TARGET CELL PHONE'S PRIMARY USER | TARGET CELL PHONE NUMBER & SERVICE PROVIDER | LOCATIONS |
|---|---|---|
| R. BUSBEE aka "Cardo" | • 937-204-7506 (T-Mobile) <br><br> • 937-972-3966 (T-Mobile) | 202 E. Bruce Avenue <br> 820 Osmond Avenue |
| GALLOWAY aka "Duke" | • 937-518-2205 (Verizon) | 2061 Kensington Drive |
| T. BUSBEE aka "Woody" | • 937-716-0118 (AT&T) | 144 Kelly Avenue |

---

[4] Case No. 23-mj-530 for the T-Mobile phones; 23-mj-531 for the Verizon phone; and 23-mj-532 for the AT&T phone as listed in the chart.

20. On December 12, 2023, a federal grand jury returned an indictment charging R. BUSBEE, T. BUSBEE, GALLOWAY, MCGUIRE, and HUGHES with federal drug trafficking crimes.

21. On December 19, 2023, I obtained search warrants authorizing the search of 2061 Kensington Drive, 202 E. Bruce Avenue, 820 Osmond Avenue, and 144 Kelly Avenue.

22. Two days later, on December 21, 2023, agents arrested R. BUSBEE, T. BUSBEE, and GALLOWAY during the execution of search warrants at 2061 Kensington Drive, 820 Osmond Avenue, 202 E. Bruce Avenue, and 144 Kelly Avenue. Agents found evidence of drug trafficking at the latter two locations.

23. As of the writing of this affidavit, MCGUIRE and HUGHES remain at large. I had previously sought and obtained a ping search warrant for MCGUIRE's cell phone (937-313-4128), which placed him in the general vicinity of the **PREMISES;** however, I was not able to locate him until on or about January 1, 2024. As I explain in more detail below, I have seen MCGUIRE at the **PREMISES** engaged in what appears to be drug trafficking.

24. Further, as I explain in more detail below, I believe that the **PREMISES** likely contains evidence of drug trafficking, such as multiple cellular devices; firearms; controlled substances; drug trafficking paraphernalia including scales, blenders, drug presses, and/or money counters; documents containing drug ledgers and indicia of occupancy; drug proceeds; luxury goods purchased with drug proceeds; and other items related to drug trafficking and conspiracy to

commit drug trafficking.

**B. In September 2022, law enforcement learned that drugs are being sold from the residences located at 130 Laura Avenue, Dayton, Ohio and 210 Basswood Avenue, Dayton, Ohio.**

25.     In September of 2022, CS1 relayed that R. BUSBEE and others are operating a "trap house" (i.e., a location used to package and sell drugs from). CS1 reported that this behavior had been going on for some time—approximately several months—prior to September 2022. CS1 stated that R. BUSBEE and his associates—MCGUIRE, GALLOWAY, and HUGHES—sell large amounts of crystal methamphetamine, fentanyl, and cocaine from the trap house and keep the drugs along with bulk United States Currency and handguns at the trap house. CS1 stated the trap house was located at 130 Laura Avenue, lower left unit, Dayton, Ohio; investigators later determined this unit to be Apartment 1. CS1 provided 937-204-7506 (one of the TARGET CELL PHONES) as R. BUSBEE's phone number CS1 explained that the DTO members shared phone numbers and, in addition to using 130 Laura Avenue as a trap house, also used 210 Basswood Avenue, Dayton, Ohio, as a trap house.

26.     On September 23, 2022, CS1 and DPD conducted a controlled purchase of suspected fentanyl from R. BUSBEE at the rear of 130 Laura Avenue. The controlled purchase was arranged through a non-recorded phone communication between CS1 and R. BUSBEE on R. BUSBEE's number 937-204-7506 (one of the TARGET CELL PHONES). During the phone communication, R. BUSBEE directed CS1 to go to the rear of 130 Laura Avenue for the purchase.

10

On or about September 23, 2022, based on information received from CS1, an amount of fentanyl was purchased at 130 Laura Avenue. I, along with DPD Sergeant Kelly Hamilton, witnessed this drug transaction, which took place at the rear of 130 Laura Avenue.

27.     For approximately the next ten months—between September 2022 and June 2023—I continued surveillance of 130 Laura Avenue and 210 Basswood Avenue using multiple investigative techniques in the hope of identifying all members of the DTO.  These surveillance techniques included both physical and electronic methods.  Throughout this time, I identified R. BUSBEE, GALLOWAY, and MCGUIRE at these locations while drug trafficking activity took place.  The transactions appeared to have a pattern in that individuals would arrive at either location and make a phone call.  Shortly thereafter, the individuals would approach the doors of the residence and make another phone call.  Usually, in the case of 130 Laura Avenue, the rear entrance door would open and after a delay, a transaction would take place.  In the case of 210 Basswood Avenue, after the second call, the individual would enter the front entrance door and almost immediately reappear and leave the area.  On multiple occasions, I witnessed either R. BUSBEE, GALLOWAY, and MCGUIRE make what appeared, based on my training and experience, to be hand-to-hand drug transactions.

28.     On June 13, 2023, I used an electronic device to record a constant stream of "customers" coming and going from the rear of 130 Laura Avenue to meet with R. BUSBEE and/or GALLOWAY for short durations of time.  This surveillance indicated that the "customers" would either walk or drive to the rear of the building, make a phone call, and wait on the rear stoop. After

11

a short period of time, the rear entrance door would open, and what appeared to be a hand-to-hand transaction would occur. After the hand-to-hand transaction took place, the customer would immediately leave the area. Based on my training and experience, as well as my observations during surveillance, this high volume and pattern of short-stay visitors is indicative of drugs being trafficked from this location.

29. On June 16, 2023, members of the DEA Dayton RO were conducting surveillance of 130 Laura Avenue. Investigators observed multiple individuals approach and conduct what appeared to me to be hand-to-hand drug purchases from R. BUSBEE at the back door of 130 Laura Avenue. Investigators requested a traffic stop of a "customer" after they made contact with R. BUSBEE at the rear of 130 Laura Avenue. At that time, a DPD marked cruiser initiated a traffic stop of the "customer," who cooperated with law enforcement and indicated that s/he just purchased cocaine from R. BUSBEE at 130 Laura Avenue.

### C. I learned that BUSBEE uses a black Cadillac to travel to and from 130 Laura Avenue.

30. During the traffic stop operation on June 16, 2023, agents witnessed R. BUSBEE drive a black Cadillac XTS, Ohio registration JUT5241. R. BUSBEE entered the black Cadillac, which was parked in front of 130 Laura Avenue, and drove away. R. BUSBEE was the only occupant in the black Cadillac. Later that day, agents witnessed R. BUSBEE return to 130 Laura Avenue in the black Cadillac, and park in front of the residence, then enter the residence through the front entrance door.

31.     Since June 16, 2023, agents have observed R. BUSBEE operating the black Cadillac on approximately a weekly basis. Agents have not seen anyone other than R. BUSBEE operating the black Cadillac. R. BUSBEE regularly drives the black Cadillac to and from 130 Laura Avenue.

**D.  The evidence suggests that the drug trafficking activities that took place at 130 Laura Avenue were significant.**

32.     I received information from a DPD analyst that between January 2023 and August 2023 there have been twenty-six (26) documented fentanyl overdoses within a six-block radius of 130 Laura Avenue. Based on my training and experience, I know that drug users often purchase drugs from a seller located near them. This reduces the cost of transportation to the user, and decreases the likelihood of the user being detected by law enforcement. Furthermore, I know, based on my training and experience, that drug users frequently ingest the drugs they purchase immediately after receiving them or soon thereafter; therefore, it is likely that drug addicts purchasing drugs from 130 Laura Avenue would take the drugs while in the vicinity. For these reasons, I believe it is likely that many, if not all, of these twenty-six overdose events stemmed from drugs purchased from 130 Laura Avenue.

33.     On July 15, 2023, DPD uniformed officers responded to an aggravated robbery and felonious assault call for service at 130 Laura Avenue.  Upon the officers' arrival they witnessed the victim, T.R., bleeding profusely from his/her right hand, which had been shot.  T.R. pointed to 130 Laura Avenue and stated, "Apartment 1 sells drugs." T.R. said s/he knows this

because "I buy drugs from them." T.R. then became uncooperative with officers and detectives and refused medical treatment. Based on my training and experience, I know that drug trafficking is a violent enterprise. I also know that drug traffickers frequently use firearms to protect themselves, their drugs, and their drug proceeds. Based on T.R.'s statements to officers—specifically, that T.R. said that drug trafficking was taking place from Apartment 1—I believe that T.R.'s injury was related to those drug trafficking activities.

34.     On July 27, 2023, DPD Detectives Mistan Bailey and John Howard responded to a fatal overdose at a residence located on Fotip Lane in Dayton, Ohio.  Two individuals overdosed: D.L. survived, but L.S. succumbed to the narcotics. During an interview with Detectives Bailey, Howard, and myself, D.L. said that after calling R. BUSBEE to buy cocaine, s/he arrived at 130 Laura Avenue to pick up the cocaine. D.L. was let into Apartment 1 by MCGUIRE's girlfriend, HUGHES.  HUGHES called an unknown individual to confirm the sale, then retreated to the kitchen area to collect the cocaine.  After completing the transaction, D.L. and L.S. went to the decedent's apartment where the cocaine was divided up for use.  L.S., after inhaling the cocaine, immediately became sweaty and dizzy, coughed, and said, "What was that?"  D.L. inhaled the cocaine and immediately became drowsy.  D.L. also said that s/he could taste an "acetone" chemical taste to the cocaine.  Both individuals then "passed out."

**E.  On August 15, 2023, R. BUSBEE was arrested after he drove the Cadillac XTS to a drug deal.**

35.     On August 15, 2023, I was informed that the Montgomery County RANGE Task

14

Force had arrested R. BUSBEE on a buy/walk operation. On that day, R. BUSBEE met a RANGE Task Force Confidential Informant ("CS2")[5] to sell him/her methamphetamine. R. BUSBEE, using the black Cadillac, transported the methamphetamine, arrived at the meeting location, and sold the methamphetamine to CS2. After selling CS2 methamphetamine, R. BUSBEE drove the black Cadillac away from the area. Law enforcement then traffic stopped R. BUSBEE and arrested him. Law enforcement recovered from inside the black Cadillac the drug proceeds from R. BUSBEE's sale with CS2. The currency recovered was separate from other monies in R. BUSBEE's possession.[6] Additionally, five cellular phones were seized during R. BUSBEE's arrest. After R. BUSBEE's arrest, the black Cadillac was towed to Sandy's Towing impound lot in accordance with police policy and procedures.

36. On August 15, 2023, I was conducting surveillance at 820 Osmond Avenue, Dayton, Ohio. I know that this location is R. BUSBEE's personal residence based on observations I've made over the course of my investigation, such as seeing R. BUSBEE enter the premises using a key to unlock the front door, and because R. BUSBEE lists it as being his address on his Ohio Identification Card. At approximately 6:35 p.m.—about two hours after R. BUSBEE had been

---

[5] CS2 has provided information to law enforcement in the past that has been independently corroborated. CS1 has never provided materially false information to law enforcement. CS2 is providing information to law enforcement for financial renumeration.

[6] Prior to the controlled buy, agents recorded the serial numbers of the currency CS2 used to complete the transaction with R. BUSBEE, which enabled law enforcement to confirm the currency seized from R. BUSBEE was the same.

arrested—I observed unknown individuals removing items from R. BUSBEE's residence at 820 Osmond Avenue, Dayton, Ohio. This activity is consistent with attempting to conceal evidence from law enforcement. I believe that R. BUSBEE directed these unknown individuals to move incriminating evidence because of a recorded phone call I listened to that R. BUSBEE had placed from the Montgomery County Jail following his arrest on August 15, 2023. R. BUSBEE remained in custody through August 21, 2023, and made a total of 25 connected phone calls to two numbers: phone number 937-716-0118 (one of the TARGET CELL PHONES), which is associated with R. BUSBEE's brother, T. BUSBEE, and phone number 213-422-1465, which is associated to a presumed girlfriend, "S███."

37.     The first jail phone call was to T. BUSBEE on August 15, 2023, during which R. BUSBEE told him to "clean his house." This is consistent with my observations of persons carrying boxes and items from 820 Osmond Avenue, Dayton, Ohio on August 15, 2023. In the jail phone calls, R. BUSBEE also discusses the transaction in which he was arrested. R. BUSBEE talked to "S██" on 213-422-1465 and discussed his incarceration. "S██" suggested to R. BUSBEE that he use another inmate's ID number so that a future call may be hidden from investigators. A subsequent call took place on August 18, 2023, to 213-422-1465 using inmate ID #█████ A█████ G█████, and the caller (whose voice matches that of R. BUSBEE) discussed with "S██" the possibility of "laying low" or running to another state, Tennessee, the west coast, or even Mexico. R. BUSBEE further described the traffic stop in which he was arrested. Additional phone calls to T. BUSBEE indicated that the items taken from the Osmond address

16

were placed in a storage locker owned by "C█████." C████ is believed to be C████ B███, the sister of R. BUSBEE and T. BUSBEE. Specifically, investigators listened to phone calls on August 17, 2023, with T. BUSBEE during which T. BUSBEE advised that C███ called the locker to see what was owed and apparently she made multiple calls that day. Additionally, investigators listened to a phone call to T. BUSBEE during which R. BUSBEE tells him to "get the 204 up. Go to Boost by KFC and get that 204." Based on investigators' knowledge of R. BUSBEE and the details of this investigation, investigators believe that R. BUSBEE was referring to R. BUSBEE's cell phone, which is (937) 204-7506 (one of the **TARGET CELL PHONES**), and requesting T. BUSBEE to get that number reactivated.

**F. On August 17, 2023, a GPS warrant for the black Cadillac was authorized.**

38. On August 17, 2023, I authored a Global Positioning System (GPS) warrant for the black Cadillac, Ohio license JUT5241. This warrant was reviewed and signed by the Honorable Sharon L. Ovington, U.S. Magistrate Judge.[7] Subsequently, the GPS unit was affixed to the vehicle.

**G. On August 18, 2023, a buy/walk occurred at 130 Laura Avenue.**

39. On August 18, 2023, members of the DEA Dayton RO conducted a buy/walk operation from the DTO. As with prior mode of operation for this DTO, a phone call was made

---

[7] Case No. 23-mj-348.

with the CS being directed to either 130 Laura Avenue or 210 Basswood Avenue. A Confidential

Source ("CS3")[8] contacted phone number 937-518-2205 (one of the TARGET CELL PHONES)

which is primarily associated with GALLOWAY and 210 Basswood Avenue. GALLOWAY

advised CS3 that nothing was going on and hung up. CS3 then contacted phone number 937-794-

4752 (one of the TARGET CELL PHONES) which is primarily associated with MCGUIRE and

130 Laura Avenue. MCGUIRE told CS3 that s/he could come by. Prior to CS3 arriving at 130

Laura Avenue, I observed an older white female conduct a transaction from the rear door of the

residence, in which she placed a tan baggie into her brassiere. She then left the area. While CS3

arrived at 130 Laura Avenue, an additional vehicle pulled to the rear. A white male and a white

female exited the vehicle and made their way to the rear door. The rear door opened, and an

exchange took place after which they returned to their vehicle. I could then see the white male

driver preparing a syringe needle for use. The driver then wrapped his right arm utilizing the

seatbelt. He then reached over to his right arm. I could not see an injection taking place; however,

the driver then closed his eyes and rested his head against the headrest of the vehicle. The needle

was given to a rear female passenger and the vehicle left the area. The rear door of 130 Laura

Avenue opened again, and a transaction took place with CS3. CS3 left the area and turned over to

investigators one gram of fentanyl. CS3 stated the transaction for the fentanyl was with

_____

[8] CS3 has been working with Dayton Police Department for monetary compensation. CS3 has provided information
that has been independently corroborated. I have deemed CS3 to be reliable and credible.

MCGUIRE.

**H.  On August 29, 2023, a buy/walk occurred at 210 Basswood Avenue**

40.     On August 29, 2023, members of the DEA Dayton RO conducted a buy/walk operation for the DTO.  As with the prior mode of operation for this DTO, a phone call was made with the CS being directed to either 130 Laura Avenue or 210 Basswood Avenue.  A Confidential Source ("CS4")[9] contacted phone number 937-518-2205 (one of the TARGET CELL PHONES) which is associated with GALLOWAY and 210 Basswood Avenue.  MCGUIRE answered the phone and when asked, told CS4 to come to 210 Basswood Avenue.  CS4 arrived in front of 210 Basswood Avenue and entered the front entrance door.  CS4 explained s/he then went upstairs where s/he saw the right upper door open.  MCGUIRE exited that door and attempted to hand CS4 a baggie of heroin.  CS4 stated they wanted "hard" (referring to crack cocaine) at which time MCGUIRE went back into the apartment and then reemerged with a baggie of crack cocaine.  An exchange of U.S. Currency took place, after which CS4 then left the area.  CS4 then met with investigators and turned over the crack cocaine.  Based on CS4's description of the location, I believe MCGUIRE was using the apartment located on the upper west side of the building.

41.     Simultaneously, on August 29, 2023, I was conducting surveillance on the rear of 130 Laura Avenue. I observed an older white male drive to the rear and park.  The white male was

---

[9] CS4 has been working with Dayton Police Department for judicial consideration.  CS4 has provided information that has been independently corroborated.  I have been deemed CS4 to be reliable and credible.

on his cellular phone.  After a brief duration the white male exited his vehicle and went to the rear stoop and stood.  Shortly thereafter he called on his phone and stood by the rear door.  After approximately five minutes the rear door opened, and an exchange took place.  The white male reached out with what appeared to be U.S. Currency and in exchange took a clear baggie with a tan substance inside.  The white male left the area.  The rear door did not close but remained cracked open.  It then opened completely to reveal R. BUSBEE as the individual inside 130 Laura Avenue who conducted the transaction.

42.     Investigators obtained toll records of R. BUSBEE's cell phone number 937-204-7506 (one of the TARGET CELL PHONES).  In reviewing those tolls and identifying numbers, investigators identified a phone number that was subscribed to C███ B███.  Based on the information in the jail call that "C███" called the storage locker multiple times, investigators obtained toll records of C███ B███'s phone calls on August 17, 2023.  Upon reviewing the toll records, investigators confirmed that C███ B███'s phone made two phone calls to Storage Rentals of America, located at 1830 Needmore Road, Dayton, Ohio 45414.  Subsequently, investigators served an Administrative Subpoena on the person of record at that facility on August 31, 2023, for renter's information and unit numbers.

43.     On September 6, 2023, I obtained a list from the Person of Record at Storage Rentals of America.  This list contained an entry in the name Cr███ B███, who is listed as currently leasing Unit 227.  C███ B███ is shown to have begun her lease of Unit 227 on July 9, 2021.

44. On September 7, 2023, I checked the passcode to Storage Rentals of America at 1830 Needmore Road that R. BUSBEE gives T. BUSBEE on the jail phone calls. When the passcode was utilized, the response was "Welcome, Ricardo," which I believe refers to R. BUSBEE whose first name is Ricardo.

45. On September 7, 2023, DPD Detective Jeremy Stewart and his K-9 partner, Weston, responded to Storage Rentals of America to conduct an open-air sniff. Weston is a trained and certified narcotic detection dog. During the open-air sniff, Weston gave a positive response for narcotics on Unit 227.

**I. On September 12, 2023, investigators seized evidence of drug trafficking at Storage Rentals of America at 1830 Needmore Road; the residence located at 130 Laura Avenue, Apartment 1; and the residence located at 210 Basswood Avenue, Apartment 4.**

46. On September 7, 2023, based on the above information, agents sought and obtained search warrants for 130 Laura Avenue, 210 Basswood Avenue, and 1830 Needmore Road, Unit 227.[10] On September 12, 2023, members of the DRO, assisted by Detroit Field Division SRT, DPD SWAT Team, and DPD detectives executed search warrants for these locations.

**i. The search of 1830 Needmore Road**

47. While serving the search warrant at 1830 Needmore Road, Unit 227, it was learned that R. BUSBEE rented Unit 249 at the same location. DPD Detective Stewart and his K-9 partner

---

[10] Case Nos. 3:23-mj-363, 3:23-mj-364, and 3:23-mj-365, respectively.

Weston, who was already on scene, conducted an open-air sniff. Weston is a trained and certified narcotic detection dog. During the open-air sniff, Weston gave a positive response for narcotics on Unit 249. A search warrant was authored and signed by the Honorable Caroline H. Gentry, United States Magistrate Judge, for Unit 249.[11] Agents searched Unit 249 and did not locate any items of evidentiary value.

48.     Agents recovered from Unit 227 the following items of evidentiary value, among others: thirteen firearms, including a sawed-off shotgun, an AR-15, an AK-47, and a MAC-10 variant; approximately 176 grams of a powdered substance that field-tested positive for cocaine; a blender bottle with white powdery substance; and a Black Samsung cellular telephone.

**ii.     The search of 130 Laura Avenue, Apartment 1**

49.     HUGHES and MCGUIRE were present inside the apartment when agents executed the search warrant at 130 Laura Avenue, Apartment 1, on September 12, 2023. Agents seized one cell phone from HUGHES and two cell phones from MCGUIRE.

50.     Agents also recovered the following items of evidentiary value from inside the apartment: multiple plastic baggies containing suspected narcotics; a metal drug press with off-white powdery residue; a Bullet blender with white powdery substance; and a black digital scale with white powdery residue.

---

[11] Case No. 3:23-mj-370.

22

51.     In all, agents recovered the following electronic devices from 130 Laura Avenue, Apartment 1:

| Device Description | Location Seized |
|---|---|
| Green iPhone | 130 Laura Ave., Apt. 1, from MCGUIRE's person |
| Purple iPhone | 130 Laura Ave., Apt. 1, from HUGHES's person |
| Black iPhone | 130 Laura Ave., Apt. 1, top of refrigerator |
| Black iPhone | 130 Laura Ave., Apt. 1, from MCGUIRE's person |
| WIKO | 130 Laura Ave., Apt. 1, kitchen cabinet |

52.     As of the date of this affidavit, all the devices seized from 130 Laura Ave. are pending forensic analysis. Since we have not been able to access the contents of the phones, I do not know whether any of these devices were assigned the same call numbers as the TARGET CELL PHONES. I know, based on my training and experience, that drug traffickers often keep the same phone number even when they switch devices because it allows them to stay in business (that is, their customers can continue to reach them).

**iii.     The search of 210 Basswood Avenue, Apartment 4**

53.     GALLOWAY was present inside the apartment when agents executed the search

23

warrant at 210 Basswood Avenue, Apartment 4, on September 12, 2023. Agents seized three cell phones from MCGUIRE.

54.     Agents also recovered the following items of evidentiary value from inside the apartment: multiple plastic baggies containing suspected narcotics; Benefiber, a common cutting agent; a black digital scale; and drug processing equipment.

55.     In all, agents recovered the following electronic devices from 210 Basswood Avenue, Apartment 4:

| Device Description | Location Seized |
|---|---|
| Black iPhone | 210 Basswood, Apt. 4, shoebox in living room |
| White iPhone | 210 Basswood, Apt. 4, from GALLOWAY's person |
| Pink iPhone | 210 Basswood, Apt. 4, from GALLOWAY's person |
| Black iPhone in red case | 210 Basswood, Apt. 4, from GALLOWAY's person |
| Black Alcatel cell phone | 210 Basswood, Apt. 4, south bedroom |

56.     As of the date of this affidavit, all the devices seized from 210 Basswood Ave. are pending forensic analysis. Since we have not been able to access the contents of the phones, I do not know whether any of these devices were assigned the same call numbers as the TARGET

24

CELL PHONES. I know, based on my training and experience, that drug traffickers often keep the same phone number even when they switch devices because it allows them to stay in business (that is, their customers can continue to reach them).

**J.** **In or about November 2023, CS1 provided information suggesting that the DTO is responsible for multiple overdoses, and that the DTO members have consistently used the TARGET CELL PHONES in furtherance of their drug trafficking activities.**

57.     In November 2023, I met with CS1 to discuss the DTO. CS1 confirmed that CS1 has known the DTO members (R. BUSBEE, MCGUIRE, GALLOWAY, and T. BUSBEE) for several years. CS1 purchased controlled substances from each of these DTO members multiple times a week for at least from summer 2023 through late September 2023. CS1, who lives in the same neighborhood as some of the DTO members and has known the DTO members for approximately 15-20 years,[12] has personally observed the DTO members working together to sell drugs since at least September 2022. CS1 knows the DTO to sell methamphetamine, crack cocaine, fentanyl, and sometimes marijuana.

58.     CS1 has used the below TARGET CELL PHONE numbers to arrange for drug purchases from the respective DTO member:

_____

[12] To protect CS1's identity, I am not including specific details about where CS1 lives and precisely how long CS1 has known the DTO members.

| TARGET CELL PHONE'S PRIMARY USER | TARGET CELL PHONE NUMBER & SERVICE PROVIDER |
|---|---|
| R. BUSBEE aka "Cardo" | • 937-204-7506 (T-Mobile)<br>• 937-972-3966 (T-Mobile) |
| MCGUIRE aka "Rico" | • 937-313-4128 (T-Mobile)<br>• 937-794-4752 (T-Mobile) |
| GALLOWAY aka "Duke" | • 937-518-2205 (Verizon) |
| T.BUSBEE aka "Woody" | • 937-716-0118 (AT&T) |

59.     When I asked CS1 for the phone numbers s/he used to buy drugs from the DTO, CS1 rattled off each of the above six phone numbers without pause and without needing to consult his/her cell phone. CS1 explained that s/he knows all the phone numbers by heart because s/he has called them so many times. CS1 explained that sometimes the DTO members would answer each other's phones. For example, sometimes CS1 would call one of the two phone numbers associated with R. BUSBEE, but MCGUIRE would answer and take CS1's drug order. CS1 would arrange to buy drugs from whichever DTO member answered the phone. CS1 knows that all the DTO members work together and that customers can use the numbers interchangeably to contact the

26

DTO for drugs.

60.     In or about the summer of 2023, CS1 obtained a blood test to determine what exactly s/he was ingesting when s/he bought drugs from the DTO. CS1's blood test reflected that s/he had cocaine, fentanyl, benzodiazepines, and xylazine in his/her system.  CS1 had only purchased drugs from the DTO.

61.     CS1 told me that s/he had consistently purchased drugs from the DTO at the multiple residences they operated: 130 Laura Avenue, 210 Basswood Avenue, 32 West Fairview Ave.,[13] Dayton, Ohio, and on at least one occasion, 820 Osmond Ave., Dayton, Ohio. CS1 explained that s/he would call R. BUSBEE, MCGUIRE, GALLOWAY, or T. BUSBEE on one of the TARGET CELL PHONES to obtain drugs, and would then be directed by whomever answered the phone to one of the foregoing residences to purchase drugs. CS1 explained that 130 Laura Avenue was the DTO's busiest location for drug sales. Oftentimes, when CS1 arrived to buy drugs, s/he observed lines of ten or more people waiting to purchase drugs. Originally, customers were directed to the front door of 130 Laura Avenue, but after a neighbor complained, the DTO instructed customers to come to the back door instead. I corroborated CS1's information by reviewing surveillance footage I had previously recorded at 130 Laura Avenue in the summer of 2023, which showed a steady stream of customers arriving at the back door of 130 Laura Avenue.

---

[13] CS1 explained that s/he purchased drugs from R. BUSBEE at 32 West Fairview Ave. during an approximately three-week period in spring-summer 2023.

I had previously corroborated CS1's information about the DTO's activities in September 2022 when CS1 and the DPD conducted a controlled buy from R. BUSBEE at 130 Laura Ave.

62. CS1 explained that when s/he arrived at either 130 Laura Avenue or 210 Basswood, the DTO member(s) present would usually direct CS1 to come inside. CS1 has been inside 130 Laura Avenue and 210 Basswood multiple times throughout 2023. When CS1 was inside these locations, CS1 observed multiple firearms and drugs. Specifically, CS1 observed drugs kept in bulk inside the kitchen cabinets. A DTO member would remove some of the drugs from the bulk quantity and weigh it on a digital scale before providing it to the customer. Oftentimes, CS1 observed firearms on the kitchen countertops and kitchen tables. CS1 said that R. BUSBEE[14] and GALLOWAY[15] often carried firearms on their person and answered the door with a firearm displayed on their hip.

63. Typically present at 130 Laura Avenue were R. BUSBEE, MCGUIRE,[16] and MCGUIRE's girlfriend, HUGHES. CS1 explained that HUGHES would sell CS1 drugs approximately once a week; the rest of the time CS1 purchased drugs at 130 Laura Avenue from

[14] CS1 referred to R.BUSBEE by his street name, "Cardo." CS1 positively identified a photograph of R. BUSBEE as the individual s/he knows as "Cardo."

[15] CS1 referred to GALLOWAY by his street name, "Duke." CS1 positively identified a photograph of GALLOWAY as the individual s/he knows as "Duke."

[16] CS1 referred to MCGUIRE by his street name, "Rico." CS1 positively identified a photograph of MCGUIRE as the individual s/he knows as "Rico."

R. BUSBEE or MCGUIRE. If R. BUSBEE and/or MCGUIRE was out of town, then HUGHES would conduct all the drug sales at 130 Laura Avenue on the DTO's behalf.

64.    Typically present at 210 Basswood Avenue when CS1 arrived to buy drugs were GALLOWAY and T. BUSBEE.[17] CS1 explained that 210 Basswood Avenue was not as busy as 130 Laura Avenue.

65.    CS1 said that throughout CS1's time as a customer of the DTO, CS1 observed multiple people get sick immediately after ingesting the drugs purchased from the DTO. For example, at 130 Laura Avenue, CS1 saw people take the drugs they'd purchased and then stumble in the backyard/alley behind 130 Laura Avenue before collapsing. CS1 has called 911 on at least three occasions due to individuals overdosing after taking the drugs that were just sold to them at 130 Laura Avenue. I was able to corroborate CS1's information by reviewing police records and reports during the salient time frame. I learned, for example, that another overdose victim, D.F., was staying in a building down the street from 130 Laura. D.F., whom CS1 knew personally, typically purchased cocaine from the DTO. On the day of D.F.'s overdose—May 19, 2023—D.F. was found deceased with a mirror and a line of powder, consistent with how cocaine is ingested. A subsequent autopsy report confirmed that D.F. had in fact ingested a fatal amount of fentanyl.

66.    I spoke with the Montgomery County coroner regarding L.S.'s death. The coroner,

---

[17] CS1 referred to T. BUSBEE by his street name, "Woody." CS1 positively identified a photograph of T.BUSBEE as the individual s/he knows as "Woody."

who performed the autopsy, confirmed that but for the fentanyl, L.S. would not have died. It appears, based on statements from survivors and CS1, that D.L., L.S., and D.F. thought that they were purchasing cocaine from the DTO, but were in fact sold fentanyl.

67.     CS1 has been present at 130 Laura Avenue and/or 210 Basswood Avenue when customers informed DTO members that the drugs the DTO had sold to them had caused them to overdose. On at least one occasion, CS1 heard R. BUSBEE laugh in response and on another occasion CS1 heard T. BUSBEE tell the customer who had overdosed that it was the customer's fault for becoming involved with drugs in the first place.

68.     Throughout 2023, CS1 has observed the DTO members wearing expensive clothes and other luxury items as well as pay for multiple rental cars. CS1 believes, based on CS1's observations and knowledge of the DTO's client base, that the DTO makes thousands of dollars a day in drug transactions.

69.     As of the date of this affidavit, all of the TARGET CELL PHONES remain active and, according to CS1, remain in use by their respective owners. CS1 has personal knowledge that the two TARGET CELL PHONES associated with R. BUSBEE—(937) 204-7506 and (937) 972-3966—and the two TARGET CELL PHONES associated with MCGUIRE—313-4128 and 937-794-4752— are active and being used by the DTO because s/he has used all four of these TARGET CELL PHONES to contact the DTO. CS1 has also used the TARGET CELL PHONES to arrange for drug purchases from the DTO.

70.     I believe that all of the TARGET CELL PHONES contain evidence relevant to my

investigation. As I described above, CS1 provided information that R. BUSBEE, T. BUSBEE, GALLOWAY, and MCGUIRE each used cell phones to communicate with CS1, other drug customers, and/or other DTO members.

### K. The evidence suggests that the DTO members continued to traffic drugs and were using the TARGET CELL PHONES to do so.

71.　　After the September 12, 2023, warrants had been executed, I conducted surveillance at 130 Laura Avenue and 210 Basswood Avenue. Based on my observations, it appeared that MCGUIRE and HUGHES no longer reside at 130 Laura Avenue. Furthermore, it appeared that GALLOWAY no longer resides at 210 Basswood Avenue. Based on my training and experience, I know it is common for drug traffickers to change their locations of operation after being detected by law enforcement. The previously observed activity at those two locations is no longer occurring.

72.　　Recent information from confidential informants, including the information from CS1 described in more detail above, indicated that the DTO members have moved out of these locations; however, the DTO members have nevertheless continued to operate their drug trafficking activities albeit from new locations and on a smaller scale. Despite knowing of 820 Osmond Avenue, law enforcement did not execute any warrants at that location. Thus, it is unlikely that R. BUSBEE is aware that law enforcement has identified it.　As detailed below, law enforcement believes R. BUSBEE is still utilizing 820 Osmond Avenue.　Additionally, as described above, CS1 indicates that the DTO members are still using the same cell phone numbers

31

previously used despite their previous cell phones being seized during the September 12, 2023, warrants. I know, based on my training and experience, that drug traffickers rely on customers and sources of supply contacting them via cell phone to arrange for transactions; therefore, the DTO members likely kept their same cell phone numbers in order to continue selling drugs even after their previous cell phones were seized. The evidence suggests that the DTO continues to operate.

**L. On December 12, 2023, a federal grand jury indicted R. BUSBEE, T. BUSBEE, MCGUIRE, GALLOWAY, and HUGHES.**

73.     On December 12, 2023, a federal grand jury returned an indictment against R. BUSBEE, T. BUSBEE, MCGUIRE, GALLOWAY, and HUGHES for, among other things, conspiracy to possess with intent to distribute and to distribute fentanyl, which resulted in death to L.S. and serious bodily injury to D.L.

**M. My investigation revealed that the DTO was using four new locations in furtherance of their drug trafficking activities.**

74.     Between December 10, 2023, through December 14, 2023, I began receiving prospective location data for the TARGET CELL PHONES pursuant to federal search warrants.

75.     As I explain in more detail below, through a combination of methods, including electronic and physical surveillance, I identified the following locations where I believe evidence of the DTO's drug trafficking is located:

**i.     202 E. Bruce Ave., upper north unit**

76.     In or about October 2023, CS1 and CS3 independently provided information to me regarding the DTO's current activities. CS1 and CS3 said that R. BUSBEE is dealing drugs

from Dayton, Ohio residences located at 202 E. Bruce Ave. and 820 Osmond Ave. On or about October 27, 2023, I surveilled 202 E. Bruce Ave. and observed R. BUSBEE there. While R. BUSBEE was present at the residence, I observed frequent, short-stay traffic to the residence. Based on my training and experience, this pattern of activity is consistent with drug trafficking. It is also consistent with the traffic I observed at 130 Laura Ave. Additionally, I have seen a vehicle I know R. BUSBEE to drive located at both of these residences within the past several weeks.

77.     On or about December 15, 2023, I conducted physical surveillance of both 202 E. Bruce Ave. and 820 Osmond Ave. I observed the same black Impala with fictitious plates in front of both residences while the ping for R. BUSBEE's phone[18] put him in the vicinity.

78.     On or about December 16, 2023, I observed R. BUSBEE exiting 202 E. Bruce Ave. and getting into the same black Impala observed previously. R. BUSBEE then drove away from 202 E. Bruce Ave.

79.     On December 16, 2023, I observed eight individuals enter the rear entrance door of 202 E. Bruce Ave. At one point R. BUSBEE went to the black Impala while two white males walked past him and into the rear. R. BUSBEE reentered the front entrance door. Others entered

---

[18] The ping data received for 937-204-7506 (T-Mobile) has been inconsistent. At times, I received clear information and at other times no data has been provided. For these reasons, I have not relied on information received on this phone and only relied upon data received from 937-972-3966 (T-Mobile) for R. BUSBEE.

the rear door. When all had left, R. BUSBEE exited the front entrance door, got into the black Impala, and left the area.

80.     I have identified R. BUSBEE's unit based on information obtained from CS3, who met with R. BUSBEE inside 202 E. Bruce Ave. within the last few weeks. Based on CS3's description of the apartment building, there are four total units: two upstairs (one on the left, one on the right), two downstairs (one on the left, one on the right). Based on CS3's description, I identified R. BUSBEE's apartment as being the upstairs, left side unit as one is facing the front of the building – the north unit. Additionally, I was able to observe four mailboxes, which is consistent with CS3's description of their being four units.

### ii.    820 Osmond Ave.

81.     As I described above, CS1 and CS3 told me that R. BUSBEE is using the residence located at 820 Osmond Ave. to traffic drugs. During my recent period of surveillance, traffic had almost ceased, however, I observed R. BUSBEE's black Impala parked in front of the residence on multiple occasions.

82.     As I described above, on or about December 15, 2023, I conducted physical surveillance of both 202 E. Bruce Ave. and 820 Osmond Ave. I observed the same black Impala with fictitious plates in front of both residences while the ping for R. BUSBEE's phone put him in the vicinity.

83.     As noted before, R. BUSBEE has used 820 Osmond Ave. to store items which were then moved by T. BUSBEE while R. BUSBEE was in jail – this activity was observed on

surveillance.  It is believed that R. BUSBEE stores items related to the DTO at this location as no search warrants were executed there.

### iii.    144 Kelly Ave., west unit

84.    As noted above, I received ping data from T. BUSBEE's phone.  The ping data has varied in distance.  Originally, the data was within a 100-meter range centering on Kelly Ave.  The range then increased to 300-400 meters, but it was still consistent on Kelly Ave.  On December 15, 2023, I spoke with CS3 who advised me that T. BUSBEE is now operating out of 144 Kelly Ave.  CS3 advised me that he/she has called GALLOWAY's phone, and GALLOWAY directed CS3 to go to 144 Kelly Ave. where CS3 met with T. BUSBEE.  CS3 advised he/she would meet with T. BUSBEE at the furthest door toward the back of the apartment complex.

85.    On or about December 16, 2023, I conducted surveillance of 144 Kelly Ave.  Based on my observations, I identified the door that CS3 described.  During my surveillance, I observed T. BUSBEE exit out of the furthest door toward the back of the complex and meet with someone driving a Suburban.  During the interaction, I observed T. BUSBEE exchange an item with the front seat passenger, with T. BUSBBE putting an unknown item back into his pocket.  Ping data for T. BUSBEE's phone is consistent with my observations.

### iv.    2061 Kensington Drive

86.    On or about December 15, 2023, I received information from CS3 that GALLOWAY is residing/dealing drugs at a house on Kensington Drive. Ping data from GALLOWAY's phone put him in this vicinity but had a radius of 135 meters.  CS3 was given the

number 2601 on Kensington Drive from GALLOWAY. However, there is no such address. I believe that CS3 was given false numbers which were close enough to the area for GALLOWAY to visually see CS3 and approach him/her. I believe that GALLOWAY's actions are consistent with someone who is fearful that law enforcement will locate him. I noted that there is a 2061 on Kensington Drive that I anticipated being a likely address.

87.     On or about December 16, 2023, and based on the ping data, I conducted surveillance in the area of Prescott Avenue and Kensington Drive. The ping data did not change for an excess of numerous hours and showed GALLOWAY's phone to be on Kensington Drive. While on surveillance in the Kensington Drive area, I observed a black Impala on the southwest corner near 2061 Kensington Drive. I ran the license plate, and learned that it returned to a female that was unknown to me at the time.[19]

88.     On December 17, 2023, I observed the ping data in the proximity of 144 Kelly Avenue. I decided to place a surveillance platform in the area, which allows for a camera to record license plates in an attempt to ascertain a license plate that could be associated with that ping data. In reviewing the footage from the evening of December 18, 2023, I observed the same license plate that I had seen at 2061 Kensington Drive on the black Impala.

89.     On or about December 19, 2023, the phone ping data still showed GALLOWAY's

_____

[19] This black Impala is a different vehicle than the black Impala that I had observed R. BUSBEE driving.

phone on 144 Kelly Avenue. However, law enforcement did surveillance in the area of 2061 Kensington to locate the black Impala. During surveillance, I did observe the black Impala parked in the driveway of 2061 Kensington Drive. I stayed in the area and later observed GALLOWAY exit 2061 Kensington Drive. He entered the black Impala passenger side while the female that I observed previously got into the driver's seat. The two then left the area. In reviewing the phone ping data, GALLOWAY's phone remained at 144 Kelly Avenue. This is consistent with my understanding of the operations of the DTO in that different individuals will use other individuals' phones during various periods of time to conduct drug trafficking business.

### v.  MCGUIRE

90.      On or about December 10, 2023, I began receiving ping data for MCGUIRE's phone.[20] Unfortunately, through approximately the end of December 2023, the ping data provided a radius of approximately 800 meters and was not consistent over single particular street/location. As I explain in more detail below, I was not able to identify a specific address associated with MCGUIRE until on or about January 1, 2024.

**N. Search warrants executed on December 21, 2023, resulted in agents seizing drug trafficking evidence and arresting R. BUSBEE, T. BUSBEE, and GALLOWAY.**

91.      On December 19, 2023, I obtained search warrants authorizing the search of 2061

---

[20] The ping data on 937-794-4752 (T-Mobile) has been inconsistent. At times, I received clear information and at other times no data has been provided. Therefore, I have not been able to rely on information provided for this phone.

Kensington Drive, 202 E. Bruce Avenue, 820 Osmond Avenue, and 144 Kelly Avenue.

92.     Two days later, on December 21, 2023, agents arrested R. BUSBEE, T. BUSBEE, and GALLOWAY during the execution of search warrants at 2061 Kensington Drive, 202 E. Bruce Avenue, 820 Osmond Avenue, and 144 Kelly Avenue. Agents seized evidence of drug trafficking, including drugs, firearms, drug trafficking paraphernalia, and/or significant sums of cash at each location, with the exception of 2061 Kensington Drive

93.     As of the date of this affidavit, R. BUSBEE, T. BUSBEE, and GALLOWAY remain in custody on federal charges.

**O.  The evidence suggests that MCGUIRE is presently staying at the PREMISES and is trafficking drugs from there.**

94.     As I mentioned above, R. BUSBEE, T. BUSBEE, and GALLOWAY have remained in custody since they were arrested on December 21, 2023. I have listened to several recorded jail phone calls they have made since their arrest. In one three-way jail phone call between R. BUSBEE, "S███" (R███ W███████), and HUGHES placed several days after R. BUSBEE's arrest, W██████ informed HUGHES of the indictment against her and MCGUIRE. W███████ instructed HUGHES and MCGUIRE to "lay low," which I believe, based on my training and experience, means to avoid attracting the attention of law enforcement in an effort to evade capture. In response to W██████'s advice, HUGHES said that "they" know where I live and that she had just gotten out of jail. HUGHES said that she works at Amazon in Vandalia on Lightner Road. I checked the Montgomery County JusticeWeb database and learned that

HUGHES's address is 127 Rockwood Avenue, Dayton, Ohio (the **PREMISES**).

95.     On January 1, 2024, I conducted surveillance of the alleyway behind the **PREMISES**. Within a one-hour period, nine individuals either drove or walked to the rear of the **PREMISES**. Each of those individuals stayed for approximately three to four minutes. Based on my training and experience, I know that this frequent short-stay traffic is consistent with drug trafficking and, more specifically, is the same behavior I witnessed in other narcotics sales involving this DTO. My surveillance on this date culminated with a male and two females walking from the rear of the **PREMISES**, placing a cell phone on a trashcan, putting a substance on the cell phone, and each inhaling the substance from the surface of the cellular phone through their noses. I then drove by the rear of the **PREMISES** and observed that all three of these individuals were sitting on the rear stoop of the **PREMISES**. I know, based on my training and experience, that drug addicts frequently consume the drugs they purchase immediately after obtaining them. I also know that the snorting behavior I observed is consistent with how drug users ingest narcotics.

96.     On January 2, 2024, I deployed a camera platform in order to watch the front of the **PREMISES**. I identified MCGUIRE coming and going from the residence. MCGUIRE appeared to have a key to enter the residence. I did not see anyone other than MCGUIRE enter or exit the **PREMISES**.

97.     During the evening hours of January 3, 2024, I observed MCGUIRE (via the camera platform) answer the front door of the **PREMISES** and exchange an item with an unknown male who had been waiting. Immediately after the exchange, the unknown male left the

39

**PREMISES** and MCGUIRE returned inside the **PREMISES** through the front door. This behavior is consistent with a hand-to-hand drug transaction.

98.     Beginning on or about January 1, 2024, the cell phone ping data for MCGUIRE's cell phone (937-794-4752) reflected that the user of the cell phone was consistently within approximately 3,500–4,000 meters of the **PREMISES**.

99.     On or about January 5, 2024, MCGUIRE's mother, A.M.,[21] called the U.S. Marshal's Office for the Southern District of Ohio, and asked to speak to me. I spoke with A.M. and she asked me if I had any information about a case against MCGUIRE. I told her I could not share any information with her, and she ended the phone call. Approximately 45 minutes later, I stopped receiving location data for MCGUIRE's cell phone (937-794-4752). The evidence suggests, based on the jail phone call between R. BUSBEE, W████████, and HUGHES, as well as the phone call MCGUIRE's mother placed to the Marshals, that MCGUIRE is aware there are pending charges against him. I believe that MCGUIRE deactivated his cell phone shortly after his mother spoke to me in an attempt to evade capture.

100.     On January 8, 2024, I learned that Applied Energy Services (AES), which is the major electric service provider for the Dayton, Ohio area, has MCGUIRE listed as the subscriber for the **PREMISES**. Information from AES also showed that the **PREMISES** was, as of January

---

[21] I am using A.M.'s initials to protect her privacy as she is not suspected of criminal wrongdoing.

3, 2024, currently using electricity (i.e., AES had recorded the metered usage for the **PREMISES**). This further bolsters my belief that MCGUIRE is presently staying at the **PREMISES**.

101.     Based on my training and experience, and as I describe in more detail below, I believe that MCGUIRE is using the **PREMISES** to sell and/or store illegal drugs, drug processing equipment, drug proceeds, and other tools of the drug trafficking trade.

102.     I know that drug traffickers typically use multiple cell phones in order to conduct their drug trafficking activities, all while attempting to elude law enforcement. I believe evidence of MCGUIRE's drug trafficking activities, as well as the identity of any as-yet unknown coconspirators, are likely stored on any cell phones in his possession (including the cell phone assigned call number 937-794-4752 that was deactivated on or about January 5, 2024).

103.     I know, based on my training and experience, and as I describe in more detail below, that drug traffickers frequently store drugs, drug proceeds, and tools of the drug trafficking trade at their residences and stash houses. I also know, based on information I've learned throughout this investigation, that the DTO members purchased luxury goods with their drug proceeds. Based on my observations of the **PREMISES**, I believe that MCGUIRE is currently selling drugs from the **PREMISES,** and that controlled substances, drug trafficking paraphernalia, firearms, drug proceeds, drug ledgers, and/or other evidence of drug trafficking are currently at the **PREMISES**.

104.     For all of the foregoing reasons, as well as for the additional reasons I give below, I believe that the **PREMISES** contains evidence of MCGUIRE's drug trafficking activities and

the activities of the DTO.

## **BACKGROUND ON DRUG TRAFFICKERS**

105.    Based on my training and experience, as well as my discussions with other law

enforcement agents, I know that the following are common practices of drug dealers:

    i.    Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

    ii.    Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

    iii.    Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits.  Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM.  Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process.  Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziploc bags, paper bindles, and/or other containers for redistribution.  It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

    iv.    Drug dealers keep books, receipts, notes, ledgers, and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved.  Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

    v.    Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash.  Drug dealers commonly keep large sums of currency, financial instruments, precious metals,

jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi. Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii. Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously

used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

viii. Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhones;

ix. Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhones in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x. Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi. Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

44

xii.    Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles;

xiii.    During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

xiv.    Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles;

xv.    Drug dealers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities, and commonly use cellular telephones to coordinate their drug trafficking activities while they travel in their vehicles; and

xvi.    Drug dealers frequently use drug proceeds to purchase luxury goods such as jewelry, watches, electronics, vehicles, and designer clothes and shoes. Drug dealers often display their wealth from the drug trafficking business in order to boost their drug trafficking sales and social status by marketing themselves as successful businessmen.

## **TECHNICAL TERMS**

106.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Computer: The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

45

b. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

107. As described above and in Attachment B, this application seeks permission to search for records that might be found on the **PREMISES**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

108. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data

46

remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

109. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes

47

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

     e.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

     f.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent

from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and

49

have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance

50

the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    i.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

110.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is

true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

111.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant. Because several people may share one or more of the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

112.   I submit that this affidavit supports probable cause for a warrant to search the **PREMISES** described in Attachment A and seize the items described in Attachment B.

53

## REQUEST FOR SEALING

113.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Gregory A. Orick
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me via reliable electronic means on January  10th , 2024.

Peter B. Silvain, Jr.
United States Magistrate Judge

54

**<u>ATTACHMENT A</u>**

*Property to be searched*

The property to be searched is 127 Rockwood Avenue, Dayton, Ohio 45405, pictured below, and further described as a three-story duplex with light-colored siding, a side gabled roof, and two roof dormers on the front of the house. There are two white front doors on the front of the building; the one on the right is 127 Rookwood. The numbers "127" are painted above the mailbox to the left of the entrance door. The front porch of the property has a wrought iron fence and concrete steps leading to the front doors. The property includes any garages, vehicles, curtilage, sheds, or outbuildings.



## ATTACHMENT B

*Property to be seized*

All records relating to violations of 21 U.S.C. §§ 841(a)(1), 843, and 846, involving Ricardo BUSBEE ("R. BUSBEE"), Torrence BUSBEE ("T. BUSBEE"), Dalaquan MCGUIRE, Demarion GALLOWAY, Doretha HUGHES, and/or others, and occurring on or after September 1, 2022, through the present, including:

1.     Logbooks, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

2.     Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long-distance telephone calls, e-mail and other correspondence.

3.     Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking.

4.     Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

5.     Electronic equipment such as surveillance video and related equipment, pagers, computers, tablets, iPads, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

6.     Cellular telephones, including all associated telephone records and stored electronic data that may be used in the commission of these offenses.

2

7. United States currency, precious metals, coins bullion, jewelry, and financial instruments(including, but not limited to, stocks and bonds), and luxury items such as designer clothing purchased with drug proceeds.

8. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

9. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

10. Contraband, such as illegal drugs and other materials, paraphernalia and/or equipment and tools used in the drug trade, including but not limited to heat sealing equipment, blenders, plastic baggies, non-controlled substances used to dilute controlled substances ("cut"), and scales.

11. Firearms and ammunition, including evidence of who purchased, received, or possessed the firearm and ammunition.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,

4

or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.